Waldo B. Russell and Marion P. Russell v. Commissioner; Melvin Harold Sidebotham v. Commissioner; Harlow M. Russell v. Commissioner; Susan V. Russell v. Commissioner; H. M. Russell, Susan V. Russell and Roderick W. Hoag, Trustees of H. M. Russell and Company v. Commissioner.
Russell v. Commissioner
Docket Nos. 136, 137, 140, 141, 111366 and 112391.
United States Tax Court
1944 Tax Ct. Memo LEXIS 226; 3 T.C.M. (CCH) 613; T.C.M. (RIA) 44191; May 31, 1944
*226 O. Walker Taylor, Esq., 31 Milk St., Boston, Mass., for the petitioners. Melvin S. Huffaker, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Juidge: These consolidated proceedings were brought for a redetermination of the following deficiencies: H. M. Russell & Company (1938) - Docket No.
111366.
Income
$6,854.62
Excess profits
4,792.28
Personal holding surtax
26,337.92
25% penalty
6,584.48
Total
$44,569.30
H. M. Russell & Company (1939) - Docket No.
112391.
Income
$139.94
Declared value excess profits
152.66
Total
$292.60
Waldo B. Russell and Marion P. Russell (1939)
- Docket No. 136.
Income
$54.81
Melvin H. Sidebotham (1939) - Docket No. 137.
Income
$16.11
Harlow M. Russell (1939) - Docket No. 140.
Income
$5,371.52
Susan V. Russell (1939) - Docket No. 141.
Income
$4,672.63
The questions involved are whether H. M. Russell & Company is taxable on royalties alleged to be due from the Russell Paper Can Company; whether respondent erred in disallowing a part of a deduction for patent amortization; whether respondent erred in disallowing a depreciation deduction on certain machinery; whether H. M. Russell & *227 Company is an association taxable as a corporation and, if so, whether it is subject to the personal holding company surtax and a penalty for failure to file a return. The individual taxpayer's cases present the question of the character of distributions to them in 1939 from H. M. Russell & Company and the possible reflection in their respective incomes of adjustments in H. M. Russell & Company income. Findings of Fact The stipulated facts are hereby found accordingly. The following are facts which, if not from the stipulations, are otherwise found from the record. Harlow M. Russell, hereinafter sometimes referred to as "Russell" and Susan V. Russell were married about 1900. At that time Russell's business was being operated as a Maine corporation. Mrs. Russell "came into the business" and it has continued ever since, but in later years, after a fire, it operated as a Massachusetts corporation under the name of Russell Box Company. Sometime after the organization of the Massachusetts corporation Russell and Mrs. Russell agreed that they would share equally in all the profits they made. Between 1920 and 1930 Russell purchased securities, taking title to about half of them in Mrs. *228 Russell's name. They had joint bank accounts. Russell experienced difficulty in handing security transactions under this arrangement and sometime in 1932 talked over the problem with their attorney, George P. Davis, who suggested the convenience and security of a trust. After several conferences a declaration of trust creating H. M. Russell & Company (hereinafter sometimes referred to as the Company) was executed on March 1, 1933. The declaration, inter alia, recited that: "* * * Harlow M. Russell, Susan V. Russell * * * and George P. Davis * * * have this day joined themselves together in an association under the name of H. M. Russell & Company, said Harlow M. Russell, Susan V. Russell and George P. Davis, hereinafter being referred to collectively as the Company, which expression shall include, wherever the context hereinafter admits, their heirs, executors, administrators, successors in trust, and assigns * * *" By its terms the trust could own real or personal property which it was to: "* * * hold and manage * * * and collect the income and proceeds thereof, and after paying * * * [expenses, including] reasonable compensation for its own services * * * [was to] dispose *229 of the net income thereof remaining and the principal thereof as follows: "1. During the period from the date of this indenture until the expiration of twenty years thereafter, unless this trust shall be sooner terminated, said Company shall pay over [quarterly or more often] the net income of the trust fund, or of so much thereof as from time to time remains in its hands or possession as follows: (a) To Harlow M. Russell - one-half (b) To Susan V. Russell - one-half." It was provided that these proportions could be varied and new beneficiaries added by the then beneficiaries. In the event of death of a beneficiary the income attributable to him was to be "paid as he * * * may by his * * * last will direct, or to his * * * legal representatives." On termination, principal was to be distributed to the beneficiaries as their proportions of income were stated. The Company was given "the same powers of management, disposition and control of the trust fund which it would have if it were the absolute owner thereof free from all trusts, subject only to its liability to account therefor * * *," including the power to retain in original form any property received by it, although not of *230 a character usual for trust investments, without liability for loss, the power to exchange, sell, mortgage upon such terms and consideration as it deems proper, and "to transfer and convey the same by good and sufficient deed * * * no purchaser or other person dealing with said Company to be responsible for the application of any purchase money or other thing of value paid to it"; to change investments and invest in common stocks without incurring liability for loss; the power to determine without recourse the determination of receipts as income or principal; the power to incur and pay liabilities, and "generally to do all such things, as are reasonably necessary or proper for the carrying out of * * * [enumerated] powers." The trust instrument further provided that any certification of any fact connected with the trust signed by all of the trustees was to be conclusive in favor of third persons acting in reliance thereon. There was a "spendthrift" provision and a provision that "any money or property payable to a married woman shall be to her separate use, free from the interference and control of any husband." Trustees could resign by delivery of instrument in writing to all the *231 beneficiaries; vacancies were to be filled by appointments by "all persons * * * then entitled to share in the income of the trust fund * * * by instrument in writing signed and acknowledged" by them; the total number of trustees was limited to five. Trustees so appointed "without any act of conveyance or transfer by the prior trustee, [were to] become and be vested with title to the trust property and * * * [entitled] thereafter [to] exercise all and the same powers and * * * be subject to the same duties as if originally appointed * * *." It was further provided: "* * * If the Company so specifies a bond may be required of any trustee under this instrument, but no trustee hereunder shall be liable for any act, misfeasance or default of any cotrustee or for more property than it or he actually receives, or for anything except its or his personal and wilful misfeasance or default." Power was specifically reserved to alter, amend, or revoke the trust by instrument in writing signed by the trustees and the beneficiaries entitled to a majority of the income. On revocation the property in the hands of the trustees was to be turned over to the beneficiaries in the proportions' in which *232 they were entitled to receive income. The Company was authorized to contract with any of its trustees. Upon the creation of the trust there was transferred to it the sum of $52,000 by a check for that amount drawn upon the joint bank account of Russell and Mrs. Russell. Other assets transferred to the trust at that time were as follows: "Notes Receivable: Specialty Automatic Ma-
chine Company
$50,000.00
Russell Paper Can Com-
pany
19,457.49
$9,457.49
"Securities: Shares
Cost
100 Russell Paper Can
Company Common
$57,250.00
2046 Sundry Investment
ment Securities
115,733.42
172,983.42
"Total (including $52,000 cash)
$294,440.91"
Title to the foregoing securities, more of which had been in the name of Russell than in the name of Mrs. Russell, were transferred to petitioner. In 1936 Waldo B. Russell, a brother of Harlow, transferred to the Company 146 shares of the common stock of Specialty Automatic Machine Company and 1,237 1/2 shares of the Russell Box Company common stock which were entered on the books of the Company at an aggregate value of $9,705.52. In the same year Melvin H. Sidebotham transferred to the Company 59 shares of the common stock of Specialty *233 Automatic Machine Company and 1,237 1/2 shares of the Russell Box Company common stock, which were entered on the books of the Company at an aggregate value of $3,404.18. Waldo Russell and Sidebotham thereby respectively acquired rights to participate in the Company's income and did so participate up through January, 1939. During 1936 the net income of the Company, in the amount of $47,324.36, was reported in the 1936 gross incomes of the four individuals as follows: Harlow Russell
$17,474.30
Susan Russell
17,474.30
Waldo Russell
8,288.93
Melvin H. Sidebotham
4,086.83
Total
$47,324.36
In their respective individual income tax returns for 1938 the following included income from the Company as indicated: Harlow Russell
$6,252.02
Susan Russell
6,252.02
Waldo Russell
1,800.03
Melvin H. Sidebotham
1,800.03
On the Company's books each individual was credited with the amount of capital contributed. At the end of each year each individual was credited by the Company with an amount, the aggregate of which was shown on the fiduciary returns filed by the Company as "distributable to beneficiaries." For the years 1933 to 1939, inclusive, the Company filed with the *234 collector of internal revenue for the district of Massachusetts non-taxable fiduciary returns (Form 1041). In each such year the fiduciary return showed all the income reported therein as "distributable to beneficiaries" and in their individual income tax returns each of the "beneficiaries" included and paid tax shown to be due on his or her part thereof. During the period involved in this proceeding Specialty Automatic Machine Company was located in Medford, Massachusetts, and manufactured machinery which was used to make paper boxes and other products. Russell Box Company was also located in Medford, Massachusetts, and manufactured paper boxes. Russell Paper Can Company was located in Chelsea, Massachusetts, and manufactured paper cans; its sales were mostly to Russell Box Company in 1936, but in subsequent years sales were made to other companies as well. Sterling Paper Converting Company was located in East Rutherford, New Jersey, and manufactured paper board. During 1938 Russell was treasurer of the Russell Carton Company and the Specialty Automatic Machine Company. He was assistant treasurer of the Russell Box Company and president and treasurer of the Russell Paper Can Company. *235 In March, 1936, the Company, the Specialty Automatic Machine Company, the Russell Box Company, and the Russell Paper Can Company entered into an agreement with reference to special machinery for making paper cans, lamp wrappers and E-Z boxes, under which title to the machines and patents was to "remain in S.A.M. Co. & H.M.R. & Co. [the Company] jointly or as their respective interests may appear or may be passed to Crosley Carton Company." It was provided that 12 1/2 percent of sales value of the products were to be paid to the Company "as rental and royalty" and that depreciation of 10 percent per annum was to be taken and deducted from rentals. The agreement was executed: "Approved Harlow M. Russell Waldo B. Russell M. H. Sidebotham S. V. Russell" The income tax returns as filed by the following individuals showed tax liability which was paid as follows in the years specified: 1937
1938
1939
Harlow Russell
$1,948.15
$423.47
$232.59
Susan Russell
1,948.15
423.47
232.59
Waldo Russell
534.89
59.14
None
M. H. Sidebotham
105.60
6.91
None
The following amounts of rents and royalties were paid H. M. Russell & Company by the companies named in the years *236 specified: 1936
1937
1938
Russell Box Com-
pany
$22,662.25
$37,419.42
$23,675.50
Russell Paper Can
Company
24,794.50
20,136.41
None
The following corporations paid the following taxes as shown to be due upon their respective income tax returns for the following years: 1937
1938
1939
Russell Box Com-
pany
$185.95
None
$1,650.58
Specialty Auto-
matic Machine
Company
313.25
None
None
Sterling Paper
Converting Com-
pany
None
$23.19
190.66
Russell Paper Can
Company
None
None
374.50
In the fiduciary return filed by the Company for the year 1938 the net income was shown to be $16,104.10, to which respondent, in his notice of deficiency of March 10, 1942, added $30,926.69 which was made up as follows: Accrued royalties
$18,258.81
Patent amortization disallowed
1,329.18
Depreciation disallowed
11,338.70
Total
$30,926.69
The amount of $1,329.18 (appearing above as "patent amortization disallowed"), as stated in the agent's report, was disallowed for the following reason: "The second group of patents was acquired from the Specialty Automatic Machine Co. The basis for computing amortization is the cost of the assignor namely, *237 $8,000.00 rather than $16,000.00 as computed in the return. The unextinguished basis, $1,914.92 has been amortized for the life remaining after December 31, 1936 * * *." The original cost of the "second group" of patents, was shown on the books of the Specialty Automatic Machine Company as $8,000.00. The books of Specialty Automatic Machine Company show that these patents were transferred to Russell Box Company for $16,000.00 as of December 31, 1932. The books of Russell Box Company show that on November 30, 1937, these patents were transferred to the Company at an amortized value of $9,914.56. The Company for the year 1938 used as a basis for computing amortization of these patents the amount of $9,914.56. In its income tax return for the year 1932 Specialty Automatic Machine Company included in its gross income the amount of $8,000.00 as gain or profit on the transaction referred to in the preceding paragraph. The income tax return for the year 1932 filed by Specialty Automatic Machine Company showed no tax due. The depreciation disallowance in the amount of $11,338.70 (referred to above) is explained in the agent's supplemental report as follows: "(a) Adjustment to set up rent *238 due from wholly owned subsidiaries in accordance with the provisions of section 45 of the Revenue Act of 1938. Taxpayer rents machinery and equipment to subsidiaries on which depreciation in the amount of $16,694.96 was claimed as a deduction in its 1938 return. On two of the companies, no income from rents was reported, but depreciation was deducted as follows: Sterling Paper Converting Co.
$ 8,437.28
Specialty Automatic Machine Co.
2,901.42
Total
$11,338.70
For the year 1937 rent in the amount of $12,135.78 was reported as received from the Specialty Automatic Machine Company. From the records available it appears that the Sterling Paper Converting Company was obligated to pay rent under a contract entered into in March 1936. Therefore, in accordance with the provisions of section 45 it is held taxpayer should have accrued rent due from its wholly owned subsidiaries equal in amount at least, to the depreciation deduction." On Schedule C of the fiduciary return for the year 1938 the Company claimed depreciation on machinery and amortization on patents in the total amount of $18,818.48, of which patent amortization in the amount of $1,329.18 was disallowed, and depreciation *239 in the amount of $11,338.70 was disallowed as explained above, leaving depreciation on machinery and amortization on patents allowed by respondent in the amount of $6,150.60. During 1938 monthly entries were made on the books of the Company accruing certain amounts as due from the Russell Paper Can Company for rents and royalties. Sometime before December 31, 1938, it was discovered that the Russell Paper Can Company was losing money. When this was called to Russell's attention sometime before December 31, 1938, he advised the bookkeeper he should not have accrued the amounts in question and instructed him to cancel the accruals. Pursuant thereto the following entry was made on the Company's books: Debit
Credit
Royalties
$18,258.81
Russell Paper Can Co.
$18,258.81
To cancel 1938 royalties, due to Can Company's losses. The Company used an accrual method of accounting. The securities and other property owned by the Company on January 1, 1938, as shown on its books of account, are as follows: Cash
$1,878.00
"Accounts Receivable: Specialty Automatic Machine Co.
$3,132.69
Russell Paper Can Company
6,531.47
Crosby Carton Company
2,313.19
Sterling Paper Converting Company
25,654.15
37,631.50
"Securities: List as at March 1, 1933
172,983.42
12,509 shares Sundry Investment Securities
103,078.79
(including 4,950 shares of common stock of Russell
Box Co. carried at 0.)
"Machinery and Equipment - Depreciated Value: In Massachusetts
109,809.21
In New Jersey
117,948.32
227,757.53
"Patents: At amortized value
14,668.50
"Total
$557,997.74"
*240 During the year 1938 petitioner acquired notes and accounts receivable as follows: Notes
$2,650.00
Pauline Russell
350.00
P. A. Russell
75.00
Edith E. Y. Russell
2,000.00
Pauline Russell
50.00
The Company owned the entire stock issue of the Russell Box Company, the Russell Carton Company, the Russell Paper Can Company, the Sterling Paper Converting Company, and the Specialty Automatic Machine Company, with the exception that part of the preferred stock of the Russell Box Company, which was the only one having preferred stock, was owned by outside interests. The investment as of January 1, 1938, and withdrawals of the four respective individuals for the year 1938, according to the books of H. M. Russell & Company (without adjustments) were as follows: Distribution
to which
investment
Investment
would entitle
1938
Name
1/1/38
Per Cent
Beneficiary
Withdrawals
Harlow Russell
$266,558.53
47,77566
$10,122.58
$7,692.82
Susan Russell
267,317.44
47,91168
10,151.40
2,665.08
Waldo Russell
16,302.82
2,92197
619.10
5,997.64
Melvin H. Sidebotham
7,759.11
1,39067
294.65
4,832.19
$557,997.74
100%
$21,187.73
$21,187.73
*241 The first time respondent made a determination that for Federal income tax purposes H. M. Russell & Company was an association doing business as a corporation and taxable as a corporation was for the taxable year 1938. From 1933 through 1939 there was no change in the method or manner of operation under the Declaration of Trust. On February 1, 1939, Specialty Automatic Machine Company and Russell Box Company executed a "Confirmatory Assignment" of patents to the Company in order to clear up titles thereto which had been questioned by respondent. On that date and for similar reasons a "Confirmatory Bill of Sale from Specialty Automatic Machine Company, and Others, to H. M. Russell and Company," covering machinery, was executed and on the same day the Company by instruments executed by Russell and Mrs. Russell, as trustees, assigned the patents and sold the machinery to them, as individuals. These patents and machinery were subsequently transferred by them to a partnership under the name of Russell and Sidebotham. Throughout 1938 and 1939 petitioner continued to own all the machinery that was used by the Sterling Paper Converting Company. The machinery comprised a large paper board *242 machine about 250 feet in length, and other machines such as beaters, refiners, and pumps. The Company purchased and acquired title to this machinery with funds obtained by it from Russell and Mrs. Russell. The Company has never declared any dividends as such. Withdrawals were made in accordance with the wishes of the various beneficiaries without reference to amounts credited as accumulations of income. They were permitted to and from time to time did withdraw portions of the principal. The Company's books never had a "General Capital Account," a "Surplus," or "Profit and Loss Account." The Declaration of Trust was not registered anywhere. The Company never held meetings or kept records or minutes; it never had any by-laws or seal. Its affairs were conducted from the residence of Russell and Mrs. Russell. The Company has never had any certificates or shares of ownership, printed letterheads, or stationery, and it has never advertised or employed clerks, salesmen or workers. It has never owned real estate. Of the Company's trustees Russell took the lead in deciding how the stock of the "Russell Companies" - the operating companies - was to be voted. The three trustees sometimes *243 signed waivers of notice of stockholders' meetings. Russell and Mrs. Russell generally attended the meetings of the corporations as trustees. Davis sometimes brought the books out to the Medford plant, and was there as trustee and as secretary of the corporations. Questions were passed upon by the respective boards of directors. The trustees would confer on questions in general and as to how they were to vote the stock. They would discuss the matter of the election of directors and treasurer, but usually Russell decided who would become members of the boards of directors. Any question as to how to vote the stock in "outside" corporations would be discussed and decided by the three trustees in the same way as the questions involving the "Russell Companies." Davis resigned as trustee July 7, 1939. An instrument executed September 1, 1939, by Russell and Mrs. Russell purported to appoint Roderick William Hoag as trustee. The machinery and patents held by the Company were acquired by it in consideration of the cancellation of some notes and accounts receivable which had been assigned to the trust by Russell and Mrs. Russell. The trustees decided to cancel the notes and accounts receivable *244 and take title to the machinery temporarily with the expectation of disposing of it at some convenient time as the occasion might arise. At the present time all of the machinery has been disposed of. Before acquiring machinery, patents, and other assets for the Company Russell advised Davis in advance of his plan for acquiring such assets and sought his approval. During the year 1938 the machinery and patents were rented by the Company to the Russell Box Company, the Russell Paper Can Company, and the Sterling Paper Converting Company. Opinion The first issue calls for disposition of respondent's determination that the petitioner company was an association taxable as a corporation. It is clear that it was not a de jure corporation. Other than this, there are five classifications of organization to which one or another of its characteristics might justify assigning it. It might have been an association, a partnership, a syndicate or joint venture, a tenancy in common, or a trust. It may be possible to avoid some of the confusion in the decided cases - the existence of which it would be idle to deny - by considering the characteristics of the Company in comparison to typical *245 organizations of these respective types. In its practice of consultation among the principal participants, periodic and mandatory division of net income, and facility of withdrawal, the Company had characteristics similar to a partnership. Cf. . In the treatment of its assets as though jointly owned it resembled a tenancy in common. Cf. , certiorari denied, . In the stated object of its creation, and apparently in the actual accomplishment of its purposes to "hold and manage the trust fund and collect the income and proceeds thereof" it acted like a traditional trust. Cf. . We think it irrelevant that these are heterogeneous elements belonging to several species of organizations, or that, while called a trust, the Company may have differed somewhat from a typical example in that field. Of the five groups enumerated only the association *246 is taxable as a corporation. [1] Where the entire net income is currently distributable to the participants, as it was here, the tax effect of any one of the remaining classifications or of all combined is the same. What is important is that these are departures from the corporate characteristics which have been thought to render enterprises taxable as associations. And there are others. The Company's income was derived principally from the kind of investment associated with passive ownership rather than active operations, as is indicated by respondent's attempt to denominate it a personal holding company. Cf. Revenue Act of 1936, section 351. It is the carrying on of business rather than the mere maintenance and preservation of investment property that we expect to find in a taxable association. . There was not only an absence of the physical evidence of shares of participating interests, but no provision was made for their transfer and none appears to have taken place. Cf. . Certainly there was no suggestion *247 of anticipation of any significant "transfer of beneficial interests" or of "the introduction of large numbers of participants." And while it is perhaps of inconsiderable consequence, there was no resort to the corporate forms in other respects. It is true that use of the trust device, even without any express provision to that effect, probably had the consequence of eliminating the personal obligation of a beneficiary for losses beyond the value of his participating interest. But we have said that the single factor of personal liability is not conclusive where other circumstances indicate the existence of an association. , affirmed , supra. That is especially true where it is "explained by the belief of the participants that the enterprise would create *248 no liabilities in excess of their original investments." Similar reasoning should be available to minimize this single aspect where although personal liability appears to have been eliminated, other characteristics of an association are absent and the circumstances suggest that it was not an important factor. The active operations which, if anything, could be expected to result in business liabilities, were carried on by the operating corporations. It was the Company's relationship to them as stockholder-lessor-licensor which gave rise to its income. To some extent, at least, the participants also actively engaged in the management of the operating corporations. But this is far from saying that the Company itself was appreciably more than an intervening conduit, that its owners were as such maintaining a quasi-corporate entity for the protection and control of a functioning business enterprise, or that the Company as distinguished from the operating subsidiaries was itself sufficiently similar to an active business corporation to justify its taxation as such. On this issue respondent's determination is disapproved. The remaining controversies which will now take the form of deficiencies *249 found against the individual petitioners all turn on questions of evidence and burden of proof. As to two of them we think petitioners have failed to establish the necessary record. An item of royalty income from one of the subsidiary corporations was first accrued on the Company's books and then cancelled by a reversing entry. The contract with the subsidiary was in writing and required the payment of specified percentages of sales "as rental and royalty." It is claimed that by reason of the subsidiary's operating loss for the year no payment was due and the accruals were properly eliminated. The question, of course, does not involve a mere matter of bookkeeping entries. If nothing was due, the Company, which was on an accrual basis, was not required to accrue the payments nor return them as income. The accruals on its books in the absence of an obligation would not create income nor presumably would the failure to accrue eliminate income arising from an accruable obligation. The question is fundamentally whether or not the payments were due, there being no assertion that they were otherwise uncollectible. The witness most active in the conduct of the Company did not testify to *250 any modification of the written agreement on direct examination. The most that he said on cross examination was that: * * * H. M. Russell Company didn't expect payment if the Russell Paper Can Company didn't make a profit. And that: The rule is there will be no royalties due if there are no products [profits?] made. Petitioner's accountant referred only to this "understanding * * * between the members of these companies and the beneficiaries and trustees of the trust that the royalties applied only if sufficient money were made by the corporation to pay them. * * *." Under the circumstances we are unable to find that these royalties were not legally payable by the subsidiary to the Company. The evidence indicates a custom or practice to waive payments in the absence of profits. But there is no evidence of an enforceable contract to that effect and the gap is particularly glaring in the face of a written contract to the contrary. Assuming that a written agreement may be modified orally, the evidence in this regard should be unequivocal. The creditor cannot merely waive a payment lawfully due, and achieve the same tax result as though there had been no obligation in the first place. *251 ; . See . And this conclusion is fortified when, because of the intimate relationship of the parties, the non-payment in itself is deprived of probative force because the existence of a creditor who would enforce payment to protect his own interests is lacking. . We think the burden of showing that the payments in question were not properly accrued has not been borne by the petitioners. For similar reasons respondent's disallowance of a claimed deduction for depreciation on certain machinery has not been shown to be erroneous. It does not appear to be seriously contended that the property in question was used by the Company in its trade or business except as an alternative to the effect that "if the petitioner is not entitled to deduct depreciation because it is not using the machinery in business it cannot possibly be held that the petitioner is an *252 association taxable as a corporation." Petitioners emphasize, however, that section 121(c), Revenue Act of 1942, permits deductions for depreciation of "property held for the production of income" and that it is retroactive. We think that such evidence as there is on the subject establishes not only that there was no use of the property in the Company's business, but also that it was not held for the production of income. Petitioners' principal witness was asked on cross examination: Q. Now what was the expectation in respect of the rent of machinery? A. There would have been no rent in that case. While the story is by no means clear, it appears that Sterling Paper Converting Company lacked the funds to acquire machinery and that the Company or its beneficiaries supplied it. The expectation was, however, "that we were going to take preferred stock in the Sterling Paper Converting Company for it," and, consequently, that no rent was charged or contemplated. It may be that this machinery was being held by Sterling Paper Converting Company for use in its business and for the production of income. But it is the petitioner company which claims the deduction, and on the facts as stated *253 that Company could not possibly have received income from it. Until it was exchanged for the stock the Company was to receive nothing and after the exchange any income would come from the stock and not from the machinery. Certainly, when that took place only the Sterling corporation could deduct the depreciation. The words "held for" import the necessity of ascertaining purpose. See . And we must conclude from the evidence that the purpose was the same throughout, which makes it appear that at all times the property was held for the production of income by Sterling and not by the Company. Bearing in mind that the Company's right to depreciation is under the statute dependent upon a showing that it ("the taxpayer") [2] was holding the property for the production of income, we find no error in respondent's determination on this point. As to the deduction for patent depreciation which respondent has reduced for failure to show an adequate basis, we think the question close but have *254 concluded that petitioners have borne their burden. It is stipulated that "the books of Russell Box Company show that * * * the patents were transferred to * * * [petitioner] at an amortized value of $9,914.56," which is the amount used by petitioners as its basis. No contradictory evidence was introduced by respondent who admits "that such books make such showing," and merely contends that the books are no evidence whatever. While certainly not conclusive, we have held that entries appearing upon books regularly maintained in the operation of a business furnish some evidence of the facts shown, sufficient to place upon respondent the burden of going forward. . We think that rule should be followed here. The entry in question purported to state a fact, namely, the figure at which property was transferred. It would be necessary to conclude that this fact was misstated in order to disregard the book entry completely. In the absence of some evidence on the subject justifying at least the creation of suspicion, we do not regard so drastic a procedure as required. On this issue petitioners are sustained. It is difficult to say *255 what emphasis respondent seeks to attach in all this to Revenue Act of 1938, section 45. In the view we have taken, only the last point could, in any event, be influenced by it. As to this he says on brief no more than "the Commissioner's determination was also correct under the provisions of section 45 * * *." At least in the absence of a plausible and reasonably self-evident showing by the mere statement of the circumstances, it seems to us that something in the nature of a formal determination, or at least of a prima facie demonstration that the adjustment is necessary to reflect income or prevent tax evasion, is called for. If there was a departure from fair value in making the transfer to the Company, cf. , respondent has not shown it, and no determination made by him gave notice to petitioners that they would be expected to carry that burden. Section 45 seems to us inapplicable here. Petitioners Harlow M. Russell, Susan V. Russell, and Waldo B. Russell admit that their net incomes for 1939 should be increased in the amounts of $424.26, $125.71, and $111.83, respectively. Enter: Decisions will be *256 entered under Rule 50. Footnotes
1. Under the 1926 Act, which was construed in the Morrissey ↩ case, there might have been some doubt about syndicates and joint ventures. But insertion of the definition of a partnership in the 1932 Act (Sec. 1111) put any such question at rest.
2. See Ways and Means Committee Report No. 2333, 77th Cong., 2nd Sess., p. 76, on The Revenue Bill of 1942.↩